BERT STEVENSON, *Appellant*, v. LAURA BELLE STEVENSON, *Appellee.*

Opinion Filed January 4, 1923.

1. Where the testimony in a suit for divorce entirely fails to establish a "wilful, obstinate and continued" desertion for a period of more than one year, and that is the only ground upon which the divorce is prayed, the divorce should not be granted.

2. In a suit for divorce upon the ground of wilful, obstinate and continued desertion for the statutory period, it is immaterial which of the parties leaves the marital home; the one who

intends bringing the cohabitation to an end commits the desertion. The party who drives the other away is the deserter, and either may drive the other away.

3. The poverty or straightened circumstances of the husband which are the result of misfortune, or temporary inability to secure employment, even if it entails some hardship upon the wife, which the husband shares, it is not a ground for divorce.

4. Where a wife severs the conjugal relation, and separates from her husband, a very strong case of a wilful and determined effort to force her to leave him, or by wrong doing, rather than poverty, to make life so unbearable that she cannot continue to live with him, is necessary to be established in order to justify a divorce.

An Appeal from the Circuit Court for St. Lucie County; E. C. Davis, Judge.

Decree reversed.

*John Zeigler,* for Appellant;

*Parker & Thomas,* for Appellee.

BROWNE, J.—This is an appeal from a decree granting Laura Belle Stevenson a divorce from her husband, Bert Stevenson, on the ground of desertion. The parties were married on the 29th of October, 1919, and lived together as man and wife, until the 15th of March, 1920. From the time of their marriage until some time in January, 1920, they lived with the defendant's mother in Jacksonville. Her husband then acquired a small home in Orange Park about 14 miles from Jacksonville, where they lived until some time in February. Her effects remained in the home in Orange Park until after she left her husband in March.

He had been unsuccessful in securing steady employment and rented a garage, and undertook to make a living in that way.

Sometime in February the wife left the home in Orange Park, and the couple lived for several weeks in the garage. During most of the time she slept on the back seat of an automobile in the garage, and he put the seats of an automobile on the floor and slept on them. The wife testified that one reason that she left the house at Orange Park and went to live in a garage, was that her husband "was in town most of the time, and it got so twice or three times he rented a room in town, twice we staid in these rooms, but the reason I did not go back to Orange Park was for the simple reason that he did not have money enough to buy gas to go out there, nor to buy a railroad ticket to go there." She also says that she refused to live in Orange Park, because she was "not able to stay alone." During the period that they lived in the garage, they took their meals sometimes with the defendant's mother, and sometimes in restaurants, but they frequently bought sandwiches, milk, etc., from a confectionery near the garage.

On the 15th of March, 1920, she left Jacksonville and went back to her parents in Vero, Fla. After being in Vero about a week, she says she got a telegram from her husband that his mother was dying, and "I went back to Jacksonville, but not to him." They lived, however, in the same house, and according to her testimony, he had a room downstairs and she had one upstairs. She staid in Jacksonville in this rooming house until about the first week in June, and during this time she helped the woman who ran the rooming house to take care of the place, and received $4.00 a week and her room and board. Part of the time she worked in a dentist's office. The first week in June she returned to her parents in Vero.

Stevenson testified that when his mother sold her home, he and his wife moved to Orange Park in a house he had contracted to purchase. He says they went to live in the garage in order to try and save a little money, but that he was not in favor of the arrangement, and he told his wife to look up a place to stay, but that she refused to do this because he had no money. This his wife admits. The husband told her to "look for a place and let me get the money afterwards." This she refused to do. When she informed her husband on March 15th that she was going back to her parents, he objected; he says, "I argued, pleaded and said to wait until my grand parents left for the North, and I would either borrow the money on my car or sell it and we would both take a trip to her home, which was of no avail." When she left for Vero, her husband went down to the train with her. In less than a week, his grandmother became quite ill and called for the members of her family, and among them, Mrs. Stevenson. The defendant at once telegraphed his wife who came to Jacksonville in response to his telegram; wiring him from Vero that she would arrive that evening. He met her at the train and at her request took her to the Chalfont Hotel, where he got her a room and they afterwards went out together to supper. Later in the evening, he says his wife told him "I told you when I was finished I was finished, now I'm done. I am going by myself and stay by myself." The next day they went together to Orange Park and got her "belongings" that had been left in the house when she moved to the garage.

The testimony showed that in addition to her belongings, there was a fair supply of groceries in the house that had been there from the time she left it in February.

About this time Stevenson had an offer of $35.00 a week to work in Augusta, Ga., but as his wife declined to go

there, he gave up the position. After his wife returned to Vero in June, Stevenson visited there several times and tried to get her to live with him. He sent her money from time to time; although not very much. It does not appear from the testimony that he was making more than what he calls "a living."

After she had left her husband some one had him arrested on a charge of vagrancy. At the trial Mrs. Stevenson admitted that he had sent her money orders which she had returned to him, and when he stated that he had "had a good home for his wife at Orange Park, with plenty of comfortable furniture and plenty to eat, but she would not come and live in it," his wife exclaimed, "Yes, a good home, and no money to buy enough gasoline to take me there." Stevenson was discharged from the charge of vagrancy.

In December of 1920, Mrs. Stevenson wrote her husband this letter: "I recd. letter and am doing as per request. Yes I told you I would come back & I will but not till after New Year for I have company here now and expect not to be bothered till after that time. I will expect the bungalo in S. Palm Beach ready for I expect a girl friend with me there for a while. I also need the $100 you promised for I sure do need better clothes to live in Palm Beach. Laure."

When his wife left Jacksonville in June, Stevenson says that he also left, with the intention of securing the first work that he could, as near where Mrs. Stevenson was, to be prepared for her confinement.

He arrived in Vero about July 10th, and there learned that his wife and her mother had left for Indian Springs, Ga. During this time he says he sent her $20.00, and material for making gowns and baby clothes. When his wife

did not return "after New Year" as she promised in her letter, he returned to Vero to ascertain why.

He rented a house in Stuart and another in Ft. Lauderdale, and his wife refused to go with him to live in either of them.

The wife makes no contention that when she left him, she was willing to return to him whenever he could make better provision for her support. On the contrary, she is quite emphatic in her statement that she did not tell him that she "would return to him at all." She asserts, "I did not say I was coming back to you. I said I would be home probably two weeks."

It seems quite clear from the testimony that at the time Mrs. Stevenson left her husband, and probably for a month prior to that, Stevenson was in rather straightened circumstances; making a bare living, but during the time they stayed in the garage she admits that he gave her money, and she used some of it to buy silk stockings.

The testimony entirely fails to show "wilful, obstinate and continued" desertion for a period of more than one year by the husband.

The defendant in error seeks to sustain the decree on the authority of Hudson v. Hudson, 59 Fla. 529, 51 South. Rep. 857, but under the facts in this case it falls far from coming within the doctrine there laid down.

Her husband objected to her leaving him, sent her small amounts of money from time to time, and made efforts towards reconciliation and a restoration of the marital relations which she had terminated. They lived together as man and wife for nearly five months, and except for the period of about three weeks, during the greater part of this

time they lived in his garage, it nowhere appears from the testimony, that he failed properly to provide and care for her, nor does it anywhere appear that he was unkind to her in the slightest degree, and while she may have been justified on account of her condition, to return temporarily to her father's home where she could be more comfortable and better cared for, there was nothing to justify her refusing to live with him when he made overtures and was in position to take proper care of her.

What the court held in the Hudson case was: "In a suit for divorce upon the ground of wilful, obstinate and continued desertion for the statutory period, it is immaterial which of the married parties leave the marital home, the one who intends bringing the cohabitation to an end commits the desertion. The party who drives the other away is the deserter, and a wife may drive her husband away."

It nowhere appears from the testimony that the husband drove his wife away from him.

For a few weeks he was in straightened circumstances, but whatever hardships she had to bear, he shared them with her. He was not unkind to her, nor neglectful of her. Bitter misfortune was his sole offending.

To affirm this decree would be to write into our statutes an additional ground for divorce, that of non-support, and that too without regard to whether the non-support was a wilful refusal to furnish the proper care and maintenance, or whether it was the result of straightened circumstances, or failure or inability to make money enough to furnish the ordinary means of support.

Where a wife severs the conjugal relation, and separates from her husband, a very strong case of wilful and deter-

mined effort to force her to leave him, or by wrong doing, rather than poverty, to make life. so unbearable that she cannot continue to live with him, is necessary to be established in order to justify a divorce. No such case appears here, and no case of desertion is made against the defendant.

The decree is reversed.

TAYLOR, C. J., AND WHITFIELD, ELLIS AND WEST, J .J., concur.